IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 15, 2022

**STATE OF TENNESSEE v. JAMES RODNEY SMITH**

**Appeal from the Circuit Court for Houston County**
**No. 2015-CR-86     Suzanne Lockert-Mash, Judge**

———————————————————

**No. M2021-00547-CCA-R3-CD**

———————————————————

The Defendant, James Rodney Smith, was convicted of arson following a jury trial, and he was sentenced to four years on probation and ordered to pay $15,000 in restitution. No appeal was filed, and the Defendant sought post-conviction relief and was permitted to file a delayed motion for a new trial and appeal. *James Rodney Smith v. State*, No. M2019-00820-CCA-R3-PC, 2020 WL 3832996, at *6 (Tenn. Crim. App. July 8, 2020) (reversing the post-conviction court's denial of post-conviction relief and remanding for a hearing on due process tolling), *no perm. app. filed*. On appeal of the conviction, the Defendant challenges the sufficiency of the evidence, the unanimity of the jury verdict, and the restitution order. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Wayne Clemons (at motion for new trial hearing and on appeal), Clarksville, Tennessee; William B. "Jake" Lockert III, District Public Defender; and Matt Mitchell and Timothy Richter, Assistant Public Defenders (at trial) for the appellant, James Rodney Smith.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Senior Assistant Attorney General; Ray Crouch, District Attorney General; and Talmage Woodall, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

In 2015, the home of the Defendant's deceased mother, Ms. Addie Lucille Smith, burned down. During the investigation that followed, the Defendant was implicated in the 2010 arson of a cabin situated on his mother's property and occupied by the Defendant's former employee, Mr. Kevin Coy. A grand jury indicted the Defendant for arson in November 2015, charging that the Defendant

> [o]n or about October 16, 2010, . . . [did] knowingly damage any structure by means of a fire or explosion without the consent of all persons who have a possessory, proprietary or security interest therein or with the intent to destroy or damage any structure to collect insurance for the damage or destruction or for any unlawful purpose, in violation of T.C.A. 39-14-301, a Class C Felony[.]

The case proceeded to a jury trial. The State's theory at trial was that the Defendant burned the cabin without the consent of Mr. Coy or to intimidate Mr. Coy or retaliate against him for having cooperated with law enforcement in a separate marijuana cultivation investigation involving the Defendant. The Defendant conceded at trial that he burned the cabin but asserted that he owned the cabin and had a right to burn it. The Defendant also asserted that he did not know until after he burned the cabin that Mr. Coy cooperated with law enforcement. The jury found him guilty of arson. No appeal was filed due to "the negligence of multiple attorneys," and the Defendant sought post-conviction relief and was permitted to file a delayed motion for a new trial and appeal. *James Rodney Smith v. State*, 2020 WL 3832996, at *6. The Defendant now appeals the conviction arguing that the State failed to show lack of consent or his intent to burn the cabin for an unlawful purpose, that the use of a general verdict form violated his right to jury unanimity, and that he was improperly ordered to pay restitution. *See* T.C.A. § 39-14-301(a) (2010).

The trial evidence showed that the Defendant's mother owned a few hundred acres of land in Houston County on which her family's farm operated until the end of her life.[1] She had three children: the Defendant; his brother, Mr. Jerry Smith; and his sister, Ms. Janet Faye Smith. Mr. Coy lived and worked on the Defendant's personal farm that adjoined the family farm, but Mr. Coy moved into the cabin on the Defendant's mother's

---

[1] Although the appellate record does not include the trial transcript, we take judicial notice of the record in *James Rodney Smith*, 2020 WL 3832996. *See State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009) (a court may take judicial notice of its own records).

- 2 -

farm to work for the Defendant's brother or the Defendant's nephew, Mr. Brian Smith, who was the Defendant's brother's son, in early 2010.

The Defendant's brother, Mr. Jerry Smith, testified that he and his siblings had reached a verbal agreement based on their mother's will and that under the agreement, he was going to inherit the part of the property on which the cabin was located. Mr. Jerry Smith ultimately inherited that part of the property after the cabin had been burned. He stated that the cabin had been built by his uncle decades before it burned. At some point around 1986 or 1987, the Defendant's brother and the Defendant moved the cabin from one location on their mother's farm to another location on the farm with the intent that the Defendant would make it his home. The Defendant worked on improving the cabin initially but abandoned the cabin when he purchased a home on a separate piece of property and moved into it. The Defendant's brother said the Defendant never lived in the cabin and never returned to the cabin after abandoning it. The Defendant's brother used the cabin as a hunting lodge and allowed someone to reside in it for a few years. Before the cabin was burned, the Defendant's nephew and Mr. Coy started renovating the cabin. The Defendant's nephew and Mr. Coy completed an unfinished cistern at the cabin, plastered the cabin, installed off-grid electricity, added a bathroom, including a shower or tub, and added doors and windows. The Defendant's brother never saw the Defendant help renovate the cabin. Mr. Coy moved into the cabin as part of an employment agreement in which he worked for the Defendant's nephew in exchange for five dollars per hour and free housing. According to the Defendant's brother, Mr. Coy was the last occupant of the cabin, and the Defendant was never the manager of his mother's farm.

The Defendant's brother testified that Mr. Coy worked with the Defendant prior to moving into the cabin. During the summer of 2010, the Defendant began cultivating marijuana on his property. The Defendant's brother received two letters from the Defendant in July 2010. The first letter stated in relevant part that Mr. Coy "r[a]n his mouth to" the Defendant's nephew and

> [i]f they keep running their mouths there will prob[ab]ly be a chopper flying my farm. So, deliv[er], the deer eat it up and I pulled it up [because] of . . . their talk. . . . If a chopper fl[ies] I may lose my farm . . . . You deliver the story to 'your' son, and make him believe it. . . . Deliver the story and never speak of this to me again. What I do is my business. . . . I will deal with [Mr. Coy] when this is over! . . . [D]eliver the story and make this s[**]t go away.

In the second letter, the Defendant wrote,

This problem was started by [Mr. Coy]. . . . Deliv[er], the story which they will want [to] believe [because] of jealous[y]. . . . Tell [your son] I showed you that I pull[ed] it up to make you believe I did. If you don't, I know [Mr. Coy] will not stop running his mouth.

The Defendant's brother testified that he understood the letters to mean that the Defendant "was wanting [him] to convince [the Defendant's nephew and Mr. Coy] that the deer[] ate his marijuana crop so that they wouldn't have any interest in it or be discussing it."

Sometime around September 2010, the Defendant's marijuana crop was raided by law enforcement agents, and the Defendant was ultimately convicted of criminal charges arising out of that incident. The Defendant's brother agreed that the letters written by the Defendant indicated he was aware that Mr. Coy knew about his marijuana crop. He also agreed that the Defendant would have known Mr. Coy lived in the cabin on his mother's farm.

In October 2010, the Defendant's brother returned home from out of state to find that the cabin had been burned. He stated that the fire department and law enforcement were present at the farm and that the cabin had been rendered to "just ashes and coals." On cross-examination, he said that Mr. Coy was not present at the cabin when it burned but was "on vacation" for a few weeks prior to the burning to visit family in West Tennessee. He testified that Mr. Coy moved "[w]hen it burnt. After it burnt that moved him out." He stated that he found several of Mr. Coy's belongings in the remains after the fire, including dog tags and old coins, tools, a burned pile of books, and remnants of the off-grid electrical system. The Defendant's brother cleaned up the site after the fire and hauled in dirt to bury the remains. He stated that he did not intentionally conceal the remains and that when he cleaned the site, he did not have proof that the Defendant had burned the cabin. According to the Defendant's brother, the Defendant drove by the cabin as it was burning but did not stop.

The Defendant's brother did not have any receipts from the renovations. The Defendant's nephew, who stood to inherit the property after the Defendant's brother, had carried out the renovations. After the cabin burned down, the Defendant's brother permitted the Defendant's nephew to cut down approximately $6,000 worth of timber on the property to help him recover some of the money he spent improving the cabin with Mr. Coy. The Defendant's brother acknowledged that he told federal law enforcement agents that he believed the Defendant burned the cabin in 2010 but stated that he was just speculating. Once the Defendant's mother passed away, the Defendant challenged the administration of the estate and sued his brother and nephew for libel and slander. The Defendant also tried to investigate who took the timber off the property. The

- 4 -

Defendant's brother denied at trial that the timber was stolen and stated that he had a one-third interest in the property. The Defendant's brother also denied burning his mother's home and did not know who did. He stated that the Defendant agreed to purchase the house for an amount lower than the insurance payment. He agreed that he received more money from the insurance payment than he would have received if the house had been sold to the Defendant. He recalled that the fire was investigated but that it burned "too hot for them to really come to any conclusion about it."

The Defendant's nephew testified that the cabin was located on property owned by the Defendant's mother. He stated that he understood the Defendant and the Defendant's sister were going to inherit other parts of the property, while the Defendant's brother was going to inherit the part of the property on which the cabin was located. The Defendant's nephew said the cabin "was a sound building" with oak hardwood floors and poplar walls and ceilings. He testified that the Defendant removed the wood stove that had been inside the cabin and left the roof exposed, which rotted out the floor. The Defendant's nephew had to replace that part of the floor before installing a new wood stove. He said that Mr. Coy began living in the cabin "six, maybe eight months" prior to any improvements being made after the Defendant asked Mr. Coy to leave the Defendant's property. Mr. Coy and the Defendant's nephew improved the cabin by cleaning out the existing cistern and adding a bathtub and shower, toilet, a septic system, off-grid solar electricity, a water pump, a new gutter, a wood stove and gas stove, a bed, and "other odds and ends . . . to make it livable." The Defendant's nephew detailed the value of those improvements on an itemized list reflecting a total of $15,859. He stated that he obtained the solar electricity components in a trade and estimated it would cost over $7,000 to replace the components. He stated that none of the items on the list belonged to the Defendant.

The Defendant's nephew made the improvements to give Mr. Coy a place to live and to rent the cabin to hunters if Mr. Coy moved elsewhere. He agreed he would not have made the improvements if the Defendant owned the cabin or was going to own it and that the Defendant never tried to stop them from improving the cabin. In October 2010, the Defendant's nephew was alerted to the fire, went to the cabin, and saw the Defendant "sitting in the pasture just before getting to the cabin in his truck." As a result, he believed the Defendant burned the cabin. After the fire, the Defendant's brother and nephew "hauled off all the burned appliances and . . . took up what was left of the foundation and hauled in some red clay with the intention of putting a house trailer there." The Defendant's nephew stated that the Defendant knew he had property in the cabin. He also stated that Mr. Coy had "[e]verything he owned" in the cabin, including books and "an ammo can full of old silver money."

On cross-examination, the Defendant's nephew stated that he cut approximately $6,000 worth of timber off of the property after the Defendant's mother passed away. He stated that his father told him to cut the timber and that they shared the proceeds. However, he denied that the money was to make up for the cost of his improvements to the cabin. Regarding the division of the Defendant's mother's estate, he believed the Defendant's sister would inherit the center of the property, the Defendant's brother would inherit the side of the property containing the cabin, and the Defendant would inherit the last part of the property.

The Defendant's nephew agreed that the Defendant was given the cabin by the Defendant's mother. He also agreed that the Defendant was going to move into the cabin originally, but he believed the Defendant abandoned it, and it was subsequently used by the Defendant's brother. He agreed the Defendant could have believed Mr. Coy abandoned it when he left the property. He believed his father told the sheriff's department the Defendant burned the cabin, but the Defendant's nephew did not personally tell the police he suspected the Defendant of burning it. He did not report the Defendant because his family was afraid of the Defendant and he did not have proof that the Defendant burned the cabin. The Defendant's nephew denied being part of the Defendant's marijuana cultivation. He agreed that he reported the Defendant to law enforcement at the request of the Defendant's brother. He said the Defendant was "threatening to kill us over it." He stated that he turned the Defendant in for growing marijuana as a confidential informant but agreed he did not turn in the Defendant for arson as a confidential informant. The Defendant's nephew acknowledged he had prior convictions relating to felony drug possession, theft of a vehicle, and concealing stolen property.

Mr. Coy testified that he worked for the Defendant in the summer of 2009 and lived on the Defendant's property. At some point, the Defendant asked Mr. Coy to help cultivate marijuana on his property, but Mr. Coy refused to help. The Defendant told Mr. Coy that the marijuana crop would be started in the next spring and told Mr. Coy "to be out by April 1." He stated that he moved from the Defendant's property to the cabin on the Defendant's mother's farm to work for the Defendant's brother and nephew. He started improving the cabin with the Defendant's nephew in March 2010. He and the Defendant's nephew "[p]ut in the septic and water, cleaned out the cistern, fixed the roof, put up a gutter," and added solar electricity components. He stated that the electricity was not operational but that all of the components were installed except for the solar panels. He lived in the cabin as part of an employment agreement with the Defendant's brother and nephew. He stated that the Defendant's mother "came and looked at the cabin and said that we [did] a fine job fixing it." On cross-examination, he stated that he did not ask the Defendant for permission to live in the cabin because the Defendant's brother and nephew claimed it as theirs and because the Defendant's mother "said it was

okay." He stored clothes, tools, cookware, a gas stove, and a collection of approximately one thousand volumes of books in the cabin. He agreed he bought the books for $200 but believed they were worth more than that.

According to Mr. Coy, the Defendant visited the cabin regularly while Mr. Coy was living in it. During the last visit in September 2010, the Defendant threatened to burn the cabin, pulled a knife on him, and threatened to kill him over a dispute concerning fruit trees that the Defendant claimed were not planted correctly. On cross-examination, Mr. Coy agreed he did not consider the Defendant's actions to be a real threat toward his life. Mr. Coy also referenced during his testimony a dispute concerning Mr. Coy's knocking over the Defendant's diesel tank but believed the Defendant's threats originated out of the controversy involving the fruit trees. Mr. Coy stated that he never discussed the diesel tank dispute with the Defendant.

In September 2010, Mr. Coy traveled to West Tennessee for approximately one month to work, bringing a suitcase of clothes and tools with him but leaving his other belongings at the cabin. He stated that he planned on returning to the cabin. On cross-examination, he stated that he placed a padlock on the cabin "to keep [the] curious out." He told the Defendant's nephew that he was leaving and believed the Defendant would find out through the Defendant's nephew. When Mr. Coy was in West Tennessee, he was contacted by a law enforcement agent about the Defendant's marijuana cultivation. He returned to the Houston County area to meet with the agent and to tell the agent that he was not involved in the Defendant's cultivation. After the meeting on October 11, 2010, Mr. Coy returned to West Tennessee. A few days later, he received a phone call informing him that the cabin burned down. He stayed in West Tennessee to work because he had no other place to go. He stated that there were solar panels located inside the cabin that had not been installed yet but believed they were burned in the fire. On cross-examination, Mr. Coy agreed he did not talk to law enforcement about the cabin burning down at the time it happened even though he suspected the Defendant of burning it.

Houston County Fire Chief David Harden testified that he responded to a fire at the cabin on October 16, 2010. According to Chief Harden, the fire was a "full involvement" fire, meaning that "the entire structure was in flames." He stated that the roof was down, most of the walls were destroyed, and none of the cabin was salvageable. No occupants were in the cabin. He stated that he classified the fire as "probably suspicious" because a neighbor informed him that the cabin had been empty for a period of time and there was no obvious natural cause. He estimated the cabin to be worth $15,000 based on a tax record.

Officer Brian Hooper was employed by the Houston County Sherriff's Department ("HCSD") on September 10, 2010, when he and other law enforcement agents found approximately 1,150 to 1,200 marijuana plants on the Defendant's farm. The HCSD notified the Tennessee Bureau of Investigation and the federal Drug Enforcement Agency ("DEA"). He believed the DEA investigation began that same day but stated they "were in and out for a couple of weeks." He stated that the DEA concluded its investigation about a month to a month and a half after September 10, 2010, and the Defendant was arrested at that time. On cross-examination, he could not recall the exact date they arrested the Defendant and estimated that it was sometime between the middle of October and the middle of November. He stated that he had been to the Defendant's farm two to three times to respond to "standard domestic issues or complaints." He recalled a complaint about a dead fish placed in a mailbox but did not know who responded to that call. He recalled receiving a report about a fence that was cut down on the property but did not know who took the report or whether any suspects were developed.

Officer Timothy Stavely was an investigator for the HCSD in September 2015, when he responded to a fire at the home of the Defendant's mother, who had recently passed away. Officer Stavely requested state arson investigators to assist with the investigation because "[t]here [were] a lot of questions surrounding the fire," and Agent Amy Lamping responded to assist. The Defendant agreed to an interview with Officer Stavely and Agent Lamping, and an audio and video recording of the interview was made. The interview lasted approximately two hours, during which the Defendant discussed topics such as the family, the disputes over the timber and division of land, a fence being cut, and the marijuana cultivation. Officer Stavely stated that he also recalled that the Defendant "maybe found a dead fish in his mailbox." He sensed that there was an ongoing feud between the Defendant and his siblings and nephew. Officer Stavely stated that the Defendant gave a letter written by the Defendant's nephew to Agent Lamping during the interview. In the letter, the Defendant's nephew accused the Defendant of burning the cabin in 2010, and when asked about the letter, the Defendant admitted to burning the cabin. The Defendant said that the cabin belonged to him and that he smelled marijuana at the cabin and burned it down. During the interview, the Defendant mentioned that "the man was missing," and Officer Stavely discovered that Mr. Coy had been living in the cabin.

Based on the Defendant's admissions, Officer Stavely started investigating the October 2010 burning of the cabin and obtained a report from Chief Harden. He also talked to the Defendant's brother, who informed Officer Stavely that Mr. Coy had been living there and that the Defendant's nephew helped improve the cabin. Officer Stavely then interviewed the Defendant's nephew and Mr. Coy about the cabin. Officer Stavely said that after the interview, "we felt like that since Mr. Coy was living there, all his

property was in the home that it was appropriate to go to the grand jury." Officer Stavely never visited the scene of the fire.

On cross-examination, Officer Stavely did not know how long Mr. Coy had been absent from the cabin before the Defendant burned it but said that Mr. Coy reported that he had been out of town for a few weeks. He recalled that the raid on the Defendant's marijuana cultivation operation took place in September of 2010 and that the cabin burned on October 16, 2010. Officer Stavely testified that the Defendant's brother and nephew and Mr. Coy had all told him Mr. Coy had belongings there. Officer Stavely further testified that he "would say" the Defendant admitted to knowing Mr. Coy was living in the cabin, explaining, "I mean he said, he was living there. He didn't say he had moved his stuff out and left. He said, the man was missing. He didn't say he took all his stuff and left and moved out." Officer Stavely stated that there was no record of the HCSD investigating the fire around the time it happened. He also agreed that there was no evidence about what was in the cabin other than witness statements. He stated that he tried to investigate who owned the cabin by looking at tax records but could not find any record of it and that he could not say for certain who owned the cabin.

The Defendant testified that his uncle constructed the cabin around 1948. In 1978, the Defendant moved the cabin to another location on his mother's farm so that he and his wife could live in the cabin. He dug a footing for the cabin, installed a cistern, and laid block. He stated that his brother helped him move the cabin and knew that the cabin was going to belong to the Defendant. However, a couple years after starting to improve the cabin, the Defendant bought a farm adjoining his mother's farm and moved onto that property with his wife. He stated that he continued using the cabin for storage and that "[i]t was recognized in my family that that building belonged to me." For example, he stored "[y]ard sale junk that people accumulated and had a little pinball machine" as well as other items he did not want to throw away. On cross-examination, he also stated that he permitted someone to live in the cabin off and on from 1985 to 1987. He stated that the cabin was never in disrepair, and he did not know about a hole in the ceiling. He claimed to have maintained control over the cabin until around 2009 when his nephew removed the Defendant's property from it and placed a padlock on the cabin without his permission.

According to the Defendant, Mr. Coy was living on the Defendant's property in a trailer but moved out and began living in the cabin. He stated that he did not give anyone permission to allow someone to live in the cabin. At some point, Mr. Coy knocked over the Defendant's diesel tank, which costed him approximately $1,100. On cross-examination, the Defendant stated he believed Mr. Coy owed him for those costs. The Defendant stated that he confronted Mr. Coy on May 3, 2010, about the diesel tank at the cabin. During the confrontation, he advised Mr. Coy to leave, but Mr. Coy "smirked" at

him. In response, the Defendant wielded a box cutter and admonished Mr. Coy. The Defendant denied that he threatened to kill Mr. Coy or burn the cabin. He agreed he did not file a police report about the diesel tank but stated he wanted to avoid starting a family dispute which he believed would involve his mother.

The Defendant testified that in the weeks following his confrontation with Mr. Coy, Mr. Coy "was just in and out of" the cabin. Approximately five or six days before the Defendant burned the cabin, he learned that Mr. Coy had been absent for approximately four to five weeks. He stated that he knew Mr. Coy would return and that it would cause a disagreement with his nephew, so the Defendant poured diesel on the cabin and set it on fire to prevent Mr. Coy from returning. He stated that no one was at the cabin at the time he burned it and that there was a padlock on the back door. He stated, "[W]hen I [saw] the lock on it I thought [the Defendant's nephew] had the thing locked and that [Mr.] Coy was gone." He reasoned that "he would probably some day want to come back and I just did not want him back there." The Defendant claimed he owned the cabin and that he did not want Mr. Coy living in it. The Defendant maintained that he did not believe there was any property in the cabin when he burned it, in part because he knew, from having previously provided Mr. Coy a place to live, that Mr. Coy did not have many belongings.

On cross-examination, the Defendant stated that his marijuana crop was raided by law enforcement on September 11 and September 12 of 2010. The Defendant agreed that he was convicted of cultivating marijuana in federal court and that his nephew and brother were the two main witnesses against him. He denied that Mr. Coy was also a witness against him but conceded that Mr. Coy testified at the sentencing hearing. He denied asking Mr. Coy to help him cultivate marijuana and stated that Mr. Coy's testimony to the contrary was false. He stated that Mr. Coy could have learned about the marijuana crop from the Defendant's nephew. He stated that he and his brother were not speaking after July 3, 2010. He also stated that he did not know until after he was arrested that Mr. Coy, the Defendant's nephew, or the Defendant's brother had spoken with the DEA about his marijuana crop on October 11. He agreed that he burned the cabin on October 16, but stated that he did so because he did not want Mr. Coy to return to the cabin rather than because someone talked to the DEA about his marijuana crop. Regarding the letter he wrote his brother, the Defendant stated that Mr. Coy started the dispute between the Defendant, his nephew, and his brother and that he did not mean the letter to be a threat but just wanted Mr. Coy to leave. He agreed his nephew also had property in the cabin. He agreed that he smelled marijuana when he approached the cabin but stated that he had already made up his mind to burn the cabin.

Mr. Kenneth Lawson, the Defendant's mother's neighbor, testified that his wife saw the cabin burning and informed him about it. He stated that the cabin was located

near his property, that he had seen the cabin "over the years," and that there was "stuff in there" like "just storage and whatever." He knew Mr. Coy was living in it but thought he was no longer living there because it had been several weeks since he saw any activity at the cabin. He agreed he did not believe Mr. Coy possessed a large amount of property at the cabin. He could not estimate the value of the cabin but stated that he did not think there was running water or electricity. He did not recall telling the Defendant that Mr. Coy left, and he stated that he did not interact with Mr. Coy often.

Mrs. Vicki Leeann Smith, the Defendant's wife, testified that she and the Defendant moved onto the Defendant's mother's farm around 1974. At some point, the Defendant's mother gave the cabin to them to live in and told them they could move it anywhere on the farm. The Defendant and his wife paid to have the cabin moved to another area on the farm, had a basement dug out, laid block for the foundation, and brought electricity to the cabin. In 1979, she and the Defendant purchased their own farm, moved onto it, and halted their work on the cabin. From then on, the cabin was used to store the belongings they did not use except for when the cabin was used by some relatives for hunting and an approximate three-year period of time before 1986 when they allowed someone to stay in the cabin. She stated that they never gave the Defendant's brother or nephew permission to have or use the cabin. She stated that the last time she saw the cabin was in 2009 and that she did not observe any improvements made to the cabin after that.

The jury convicted the Defendant as charged on one count of arson, and he was sentenced to four years on probation and ordered to pay restitution by the trial court in the amount of $15,000 to the Defendant's nephew. The final judgment was entered on October 11, 2017, and filed on November 28, 2017. On April 18, 2018, the Defendant filed a pro se motion challenging the award of restitution and requesting a hearing for a judgment of acquittal. On May 1, 2018, the trial court entered an order denying the motion on the ground that the Defendant failed to file a motion for new trial within the thirty-day timeframe required by Tennessee Rule of Criminal Procedure 33.

On February 12, 2019, the Defendant, through private counsel, filed a petition for post-conviction relief, requesting due process tolling of the one-year statute of limitations governing his petition and requesting the ability to file a late motion for new trial based on receiving the ineffective assistance of counsel. The post-conviction court dismissed the petition on the grounds that the Defendant failed to comply with the statute of limitations in filing his petition and that there were no grounds for tolling the statute of limitations. On appeal, this court reversed the post-conviction court's decision, concluding that the Defendant pleaded sufficient grounds for tolling based on receiving incorrect information from various attorneys and confusion regarding his legal representation, and we remanded the matter to the post-conviction court for a hearing to

determine whether the statute of limitations should be tolled. *James Rodney Smith*, 2020 WL 3832996, at *7.

After the case was remanded to the post-conviction court, the court entered an agreed order granting the Defendant's petition for post-conviction relief and permitting the Defendant to file a delayed motion for new trial. The Defendant filed a motion for new trial and an amended motion, claiming that the evidence was not sufficient to convict him of arson, that the general verdict violated his right to a unanimous jury verdict, and that the trial court erroneously ordered restitution. The Defendant attached affidavits to his amended motion regarding the ownership of the cabin and tending to impeach the Defendant's nephew's trial testimony about the origin of the solar electrical equipment and the purpose of cutting the timber. At the hearing for the motion for new trial, Mr. Coy generally testified consistently with his trial testimony. When asked if the incident in which the Defendant pulled a knife on him occurred around May 1, 2010, Mr. Coy responded, "If you say so." On cross-examination, he answered affirmatively when asked if the incident occurred "right before [he] left" for West Tennessee. Mr. John Henry Hodges testified that he worked for the Defendant around 2009-2010 and was present in May 2010 when the Defendant became angry about the fruit trees. The trial court denied the motions, and the Defendant appeals.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to support his arson conviction. Reviewing the sufficiency of the evidence supporting a criminal conviction requires this court to first "examine the relevant statute(s) in order to determine the elements that the State must prove to establish the offense." *State v. Stephens*, 521 S.W.3d 718, 723 (Tenn. 2017). Next, we determine "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 724 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). If the evidence is insufficient to support the finding of guilt beyond a reasonable doubt, the finding of guilt "shall be set aside." Tenn. R. App. P. 13(e). Once a defendant has been convicted, the presumption of innocence is replaced with a presumption of guilt on appeal. *Turner v. State*, 394 S.W.2d 635, 637 (Tenn. 1965). To overcome a presumption of guilt on appeal, the defendant bears the burden of showing the evidence presented at trial was "insufficient for a rational trier of fact to find guilt of the defendant beyond a reasonable doubt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982) (citing *State v. Patton*, 593 S.W.2d 913 (Tenn. 1979)).

On appeal, the State "is entitled to the strongest legitimate view of the trial evidence and all reasonable and legitimate inferences which may be drawn from the evidence." *State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003) (citing *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999); *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). This court may not reweigh or reevaluate the evidence, because "[q]uestions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Id.* at 236 (citing *Bland*, 958 S.W.2d at 659). After a guilty verdict has been entered, the testimony of the State's witnesses is accredited, and all conflicts in the testimony are resolved in favor of the theory of the State. *State v. Nichols*, 24 S.W.3d 297, 301 (Tenn. 2000) (citing *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)).

A defendant's guilt may be supported by direct evidence, circumstantial evidence, or a combination of both. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). Whether the evidence underlying the defendant's conviction at trial was direct or circumstantial, the same standard of review applies. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Here, the Defendant was convicted of arson of a structure, which required the State to prove that he "knowingly damage[d] any structure by means of a fire or explosion:"

(1) Without the consent of all persons who have a possessory, proprietary or security interest therein; or

(2) With intent to destroy or damage any structure to collect insurance for the damage or destruction or for any unlawful purpose.

T.C.A. § 39-14-301(a) (2010). "'Knowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." T.C.A. § 39-11-302(b); *State v. Gene Shelton Rucker, Jr.*, No. E2002-02101-CCA-R3-CD, 2004 WL 2827004, at *10 (Tenn. Crim. App. Dec. 9, 2004) (arson is a nature of conduct offense).

When viewed in the light most favorable to the State, the evidence showed that Mr. Coy moved into the cabin with his belongings in March 2010 to work for the Defendant's brother or nephew pursuant to an agreement in which Mr. Coy traded work in exchange for housing. The Defendant's mother, who owned the real property on

- 13 -

which the cabin stood, told Mr. Coy that "it was okay" for him to live there, and the Defendant was aware that Mr. Coy was a tenant of the cabin. Mr. Coy helped the Defendant's nephew improve the cabin, which included among other things completing an unfinished cistern, plastering the cabin, building a bathroom, and adding doors, windows, and a solar electricity system. The improvements totaled $15,859 in value. In September 2010, Mr. Coy traveled to West Tennessee for approximately one month to work, leaving all of his belongings at the cabin except a suitcase of clothes and some tools he brought with him. Mr. Coy padlocked the door before leaving. The Defendant conceded at trial that he visited the cabin on October 16, 2010, and observed that it was padlocked and smelled marijuana, but he burned the cabin to prevent Mr. Coy from returning to it. In his interview with Officer Stavely, he acknowledged burning the cabin and said that "the man was missing." Although the Defendant claimed to have maintained sole possession of the cabin until he burned it, the jury implicitly declined to credit his testimony. *See Evans*, 108 S.W.3d at 236. The jury could have rationally concluded that the Defendant knew Mr. Coy was a tenant of the cabin but burned the cabin without Mr. Coy's permission. Accordingly, the evidence was sufficient to support the Defendant's conviction under section 39-14-301(a)(1).

Alternatively, the evidence showed that the Defendant wrote letters to his brother expressing concern about a dispute with his nephew and Mr. Coy. In the letters, the Defendant instructed his brother to tell the Defendant's nephew and Mr. Coy that deer ate his marijuana crop and that the Defendant pulled up the crop to make them stop talking about it. He warned that "[i]f they keep running their mouths there will prob[ab]ly be a chopper flying my farm" and that he would "deal with [Mr. Coy] when this is over." Prior to Mr. Coy traveling to West Tennessee for work in September 2010, the Defendant confronted Mr. Coy at the cabin, wielded a boxcutter, threatened "to burn the cabin down and kill" Mr. Coy, and told him to move out of the cabin. Mr. Coy left to work in West Tennessee, but he received a phone call from a law enforcement agent and returned to Houston County to talk to the law enforcement agent about the Defendant's marijuana cultivation. Mr. Coy stated that a few days later, he received a phone call informing him that the cabin burned. He stated that he stayed in West Tennessee because he had nowhere else to go. A law enforcement report dated October 11, 2010, reflected that Mr. Coy cooperated with the investigation. The Defendant's nephew testified that he was a confidential informant in the Defendant's marijuana cultivation case, and the Defendant's brother recalled talking to law enforcement in October 2010 about the case. On October 16, 2010, the Defendant burned the cabin. Although the Defendant said that he did not know at the time he burned the cabin that his brother, nephew, or Mr. Coy cooperated with law enforcement, the jury, through their verdict, declined to credit his testimony. *See Evans*, 108 S.W.3d at 236. The jury could have rationally found that the Defendant burned the cabin for the unlawful purpose of intimidating Mr. Coy or retaliating against him for Mr. Coy's cooperation with law enforcement in the drug case. T.C.A. § 39-14-

301(a)(2) (2010). Therefore, the evidence was sufficient to support the Defendant's arson conviction.

## II. Unanimity of the Jury Verdict

The Defendant contends that his right to jury unanimity was violated by the general verdict in this case. The indictment charged that the Defendant

> [o]n or about October 16, 2010, . . . [did] knowingly damage any structure by means of a fire or explosion without the consent of all persons who have a possessory, proprietary or security interest therein or with the intent to destroy or damage any structure to collect insurance for the damage or destruction or for any unlawful purpose, in violation of T.C.A. 39-14-301, a Class C Felony[.]

There is no dispute that the State proceeded to trial using the alternative theories of arson in sections 39-14-301(a)(1)-(2) (2010). Following the close of evidence, the trial court instructed the jury that the State had to prove the following elements beyond a reasonable doubt in order to convict the Defendant of arson:

> (1) that the defendant knowingly damaged a structure by means of fire or explosion; and

> (2)(a) that the defendant did so without the consent of all persons who have a possessory, proprietary or security interest therein; or

> (2)(b) that the defendant did so with intent to destroy or damage the structure to collect insurance for the damage or destruction or for any unlawful purpose.

The Defendant challenged in his motion for new trial that the general verdict form permitted the jury to convict him of arson without distinguishing which conduct it found him guilty beyond a reasonable doubt of committing. The Defendant claimed that his right to a unanimous jury verdict was violated because the arson statute established two criminal offenses and that the general verdict form did not require unanimity as to either offense. At the conclusion of the motion for new trial hearing, the trial court found that he was charged with one count of arson and that the instruction provided alternative theories of guilt. The trial court found that "there's no distinct separate acts; there's just one act and the reason for that. . . . [T]he evidence only indicated one offense, that there was a burning of a cabin." The trial court found that there was no need for an election of offenses because the evidence did not establish that multiple offenses were committed.

- 15 -

The court also found that it instructed the jury that its verdict had to be unanimous and that the jury was presumed to have followed the court's instructions. The trial court denied the Defendant's motion, and the Defendant appeals.

On appeal, the Defendant maintains that his right to a unanimous jury verdict was violated by the general verdict form which did not distinguish between the two theories of arson. He maintains that Tennessee Code Annotated sections 39-14-301(a)(1) and (a)(2) of the arson statute establish distinct offenses and that a general verdict form precluded the assurance of jury unanimity in either offense. The State responds that arson is one offense that can be proven under alternative theories and that the general verdict form ensured jury unanimity on his guilt of arson. We agree with the State.

The right to a jury trial protected by the Tennessee and United States Constitutions requires that a jury's verdict be unanimous. *See State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020) (incorporating the right to a unanimous jury verdict protected by the Sixth Amendment to the United States Constitution into the Fourteenth Amendment's protections applicable to the states). "[A] defendant's right to a unanimous verdict before imposition of conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of assembling a 'patchwork verdict' based on the different offenses in evidence." *Tidwell v. State*, 922 S.W.2d 497, 501 (Tenn. 1996) (citing *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993)). The State must generally elect facts upon which it is relying to establish the charged offense when there is proof of multiple offenses supporting a single charged offense. *State v. Johnson*, 53 S.W.3d 628, 630 (Tenn. 2001). Accordingly, "[w]hen evidence is presented of multiple offenses that would fit the allegations of the charge, the State must elect the particular offense for which a conviction is sought, and the trial court must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected." *State v. Riley Christopher Wilburn*, No. M2020-00130-CCA-R3-CD, __ S.W.3d __, 2021 WL 2554209, at *3 (Tenn. Crim. App. June 22, 2021), *perm. app. denied* (Tenn. Oct. 13, 2021). This requirement protects the defendant's right to "a unanimous jury verdict by ensuring that jurors deliberate and render a verdict on the same evidence." *Johnson*, 53 S.W.3d at 631 (citing *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999)).

"'Generally, alternative theories, mental states, modes of committing the crime, or means by which the crime was committed may be submitted to the jury without necessity of precautions to assure jury unanimity.'" *State v. Hood*, 221 S.W.3d 531, 547 (Tenn. Crim. App. 2006) (emphasis omitted) (quoting *State v. James Clayton Young, Jr.*, No. 01C01-9605-CC-00208, 1998 WL 258466, at *5 n.4 (Tenn. Crim. App. May 22, 1998)); *see also* T.C.A. § 40-13-206(a) ("When the offense may be committed by different

- 16 -

forms, by different means or with different intents, the forms, means or intents may be alleged in the same count in the alternative."). Additionally,

> Where the intent with which, the mode in, or the means by which, an act is done are essential to the commission of the offense, and the offense may be committed with different intents, in different modes, or by different means, if the jury is satisfied that the act was committed with one (1) of the intents, in one (1) of the modes, or by either of the means charged, the jury shall convict, although uncertain as to which of the intents charged existed, or which mode, or by which of the means charged, the act was committed.

T.C.A. § 40-18-112. "The right of jury unanimity has never required more than a general verdict in cases where only one offense is at issue based on a single criminal occurrence." *State v. Lemacks*, 996 S.W.2d 166, 171 (Tenn. 1999).

Whether the jury's general verdict in this case raises concerns about unanimity depends on whether the arson statute codified in Tennessee Code Annotated section 39-14-301 (2010) provides for a single offense or multiple offenses. "A court's role in construing a statute is to ascertain and give effect to legislative intent." *State v. Siliski*, 238 S.W.3d 338, 362 (Tenn. Crim. App. 2007) (citations omitted). Legislative intent is derived "from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning." *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000). When a statute's language is clear and unambiguous, we "must apply its plain meaning in its normal and accepted use, without a forced interpretation that would extend the meaning of the language and, in that instance, we enforce the language without reference to the broader statutory intent, legislative history, or other sources." *Carter v. Bell*, 279 S.W.3d 560, 564 (Tenn. 2009). We will not "apply a particular interpretation to a statute if that interpretation would yield an absurd result." *Flemming*, 19 S.W.3d at 197. We review issues of statutory construction de novo without a presumption of correctness. *State v. Edmonson*, 231 S.W.3d 925, 927 (Tenn. 2007).

The arson statute at issue here provides in relevant part that "a person commits an offense who knowingly damages any structure by means of a fire or explosion:"

> (1) Without the consent of all persons who have a possessory, proprietary or security interest therein; or
>
> (2) With intent to destroy or damage any structure to collect insurance for the damage or destruction or for any unlawful purpose.

- 17 -

T.C.A. § 39-14-301(a) (2010). We first observe that the statute in part conditions criminal liability for a person "who knowingly damages any structure by means of a fire or explosion." The unit of prosecution for arson is the number of distinct structures burned. *State v. Lewis*, 958 S.W.2d 736, 738-39 (Tenn. 1997) (vacating four of the defendant's five convictions for arson where only a single apartment building was burned but several apartment units within the building were destroyed). In other words, a defendant could not be convicted of more than one offense of arson under section 39-14-301 if no more than one structure is damaged. *See id*. Accordingly, subsections (a)(1) and (a)(2) do not create multiple offenses of arson for the Defendant's burning of a single structure. Instead, the statute establishes one offense of arson which may be accomplished using alternative modes.

Accepting the Defendant's argument to the contrary would effectively require "the State to 'elect the *facts to support elements* rather than make an election of *offenses*,'" when our case law does not require jury unanimity regarding the modes by which a single crime is committed. *State v. Joseph Scott Morrell*, No. E2013-02431-CCA-R3-CD, 2014 WL 4980400, at *9 (Tenn. Crim. App. Oct. 7, 2014) (quoting *State v. Adams*, 24 S.W.3d 289, 297 (Tenn. 2000)) (emphasis in *Adams*). This court has previously held that the State is not required to make an election when a statute presents alternative modes of committing a single offense. *See Lemacks*, 996 S.W.2d at 171 (election of guilt by criminal responsibility or direct responsibility not required for a single offense of DUI); *Riley Christopher Wilburn*, __ S.W.3d at __, 2021 WL 2554209, at *5 (election not required for prosecution under alternative theories of DUI *per se* and DUI by intoxication for one DUI offense); *Joseph Scott Morrell*, 2014 WL 4980400, at *9 ("That the offense of DUI may be committed by either driving or being in physical control of a vehicle does not change our conclusion because the need for election is not implicated by the statutory use of proscriptive terms in the disjunctive."); *State v. Gerry Tallant*, No. W2009-00585-CCA-R3-CD, 2011 WL 303216, at *8 (Tenn. Crim. App. Jan. 25, 2011) (prosecution of the defendant for first degree murder under alternative theories of guilt as a principal offender or guilt via criminal responsibility did not require more than a general verdict). The fact that a defendant has met the criteria for prosecution under two or more theories of an offense does not transform one offense into two.

This court has previously upheld an arson conviction in which the State presented evidence that multiple modes were used to commit the offense. *See State v. Gann, Jr.*, 251 S.W.3d 446, 456 (Tenn. Crim. App. 2007). In *Gann, Jr.*, the evidence showed that the defendant killed the victim in a home owned by the victim's mother and set fire to the home. *Id.* The victim's mother testified that she did not give the defendant permission to burn her home. *Id.* The jury convicted the defendant of arson, and on appeal, we affirmed the conviction on the ground that the evidence established that he burned the home without permission of the victim's mother and for the unlawful purpose of

concealing his murder of the victim. *Id.* Similarly, the evidence in the present case showed that the Defendant burned the cabin Mr. Coy was living in without Mr. Coy's permission and burned it for the purpose of intimidating or retaliating against Mr. Coy for cooperating with law enforcement in the Defendant's drug case. "[W]here the State seeks to prove one crime arising from one event, we may presume that the jury's general verdict was unanimous." *Lemacks*, 996 S.W.2d at 171. The general verdict in the Defendant's case sufficiently ensured jury unanimity on his guilt of arson. The jury was presented evidence showing the Defendant burned one structure, the cabin, and the jury returned a guilty verdict for one count of arson. Thus, the jury's general verdict was unanimous.

### III. Restitution

The Defendant challenges the restitution order requiring him to pay $15,000 in restitution to his nephew. Although the judgment form reflects the above restitution amount, the Defendant failed to include the sentencing hearing transcript in the appellate record. We note that during a hearing on a motion to withdraw and suspend restitution which took place in August 2019, the Defendant's counsel advised the trial court that the Defendant "[h]ad a sentencing hearing, and at the sentencing hearing it was agreed upon to waive the sentencing hearing and the [D]efendant and the State entered into an agreement where he would have a four[-]year sentence and some restitution to be owed." "When a party seeks appellate review there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). The failure to prepare an adequate record for appellate review results in waiver. *Id.* Thus, in the absence of a complete record, "the appellate court must conclusively presume that the ruling of the trial judge was correct." *State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990). Because the sentencing hearing is missing from the appellate record, we conclude that the Defendant's challenge to the restitution has been waived. *See id.* The Defendant is not entitled to relief.

### CONCLUSION

Based upon the foregoing reasons, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE

- 19 -